**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| **ROBERT WILLIAMS,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No.: 1:15-cv-01255-GBL-TCB** |
| | ) |
| **RICOH AMERICAS CORP.,** | ) |
| | ) |
|     **Defendant.** | ) |

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robert Williams, by and through counsel, hereby files this Response in

Opposition to Defendant's Motion for Summary Judgment (Dkt. No. 36) filed with this Court on

June 10, 2016. Despite Defendant's assertions to the contrary, this matter reveals how an

employee's exercise of his right to complain about discrimination of the basis of his race led to

his subsequent termination. As such, genuine disputes of material facts exist as to the allegations

in Plaintiff's Amended Complaint (Dkt. No. 3), and so Defendant Ricoh USA, Inc.'s (Ricoh's)

Motion should be denied and the Court should allow this case proceed to a jury trial.[1]

## I.    Factual Background

Plaintiff Robert Williams is a 58 year old African American male, who started working

for Ricoh in 2000.  Williams worked for Ricoh as a Commercial Account Manager from 2000 to

2004, and as a Federal Accounts Manager from 2004 to his termination on January 15, 2015.

Williams worked at Ricoh's Greenbelt, Maryland facility from 2000 to 2014, and at Ricoh's

---

[1] Plaintiff's Amended Complaint (Dkt. No. 3) sets forth four causes of action - discrimination
(Count I) and retaliation (Count II) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §
2000e, et seq. ("Title VII"), and discrimination (Count III) and retaliation (Count IV) under the
Age Discrimination in Employment Act, 29 U.S.C. § 623(d) ("ADEA").  Defendant moved for
summary judgment on all four counts, and Plaintiff concedes that summary judgment is due to be
granted on Counts III and IV (asserting discrimination and retaliation under the ADEA).

Alexandria, Virginia office from 2014 to his termination on January 15, 2015. Ex. 1, Glancey, Dep. Tr. 84:15-17; 102:13-15. Thomas Glancey, a Caucasian male, became Williams's supervisor on June 1, 2012. Ex. 1, Glancey, Dep. Tr. 22:20-22. Glancey was and is employed by Ricoh as a Region Sales Manager, and supervised approximately nine employees, including Williams. Ex. 1, Glancey, Dep. Tr. 25:2-4.

Glancey developed the opinion that Williams would be a "problematic employee" while Glancey was still in the process of being hired as a Region Sales Manager. Glancey testified, however, that he never saw any documentation evidencing or otherwise corroborating his opinion that Williams was a problematic employee. Ex. 1, Glancey, Dep. Tr. 39:3 – 40:22. After becoming Williams's Manager, Glancey began to treat Williams unfairly as compared to other non-African American employees. Ex. 2, Williams, Dep. Tr. 165:13 – 166:24. Kelly Wynn, an African American employee, also testified that he was told by some of Williams's co-workers that Glancey had a slave master mentality. Ex. 3, Wynn, Dep. Tr. 38:19 – 39:6. Wynn said that Glancey's "slave master mentality" was "well-noted dialogue that was had amongst peers," and that Randall Smith, a Ricoh employee named "Clarence" [*presumably Terrance Deanes*], and another Ricoh employee also said that Glancey had a slave master mentality with respect to African American employees. Ex. 3, Wynn, Dep. Tr. 39:17 – 21; 41:6 - 19.

Duane Graves, another African American colleague of Williams, testified that "Glancey was looking for reasons to get rid of the black sales employees under him," and that when Glancey terminated an African American employee, Glancey always filled the position with a Caucasian employee. Ex. 4, Graves, Dep. Tr. 81:2 – 7; 12-15. Similarly, another African American colleague of Williams, Alexander Johnson, testified that Glancey was pressuring Johnson to leave Ricoh so that Glancey could give Johnson's job to a Caucasian female

[Kathleen Evans] who had no prior experience in the industry. Ex. 5, Johnson, Dep. Tr. 69:13 – 71:12. Likewise, Johnson testified that Glancey issued warnings to African American employees who missed meetings, but did not do the same for Lance Helmick and Dan Logan, Caucasian employees who also missed meetings. Ex. 5 Johnson, Dep. Tr. 72:10 – 18; 119:11 – 120:13. Johnson also testified that "Williams spoke up about Glancey's unfair treatment, as the rest of his colleagues were afraid to report it." Ex. 5, Johnson, Dep. Tr. 106:5 – 17. Johnson identified the colleagues who were afraid to report Glancey's unfair treatment as Randall Smith, Mark Evans, and a man named Kevin, all of whom were African American. Ex. 5, Johnson, Dep. Tr. 107:9 – 108:4. Johnson also testified that in his opinion, Glancey was prejudiced against minorities, including African Americans. Ex. 5, Johnson, Dep. Tr. 117:2 – 20.

On June 14, 2013, Williams engaged in protected activity when he emailed Glancey in order to both oppose what Williams reasonably believed to be discriminatory actions taken by Glancey against Williams on the basis of Williams's race, as well as to request a meeting with Ricoh's Human Resources department to address Williams's complaint. Williams emailed Glancey, stating:

> Tom, I will request a meeting with Human Resources ASAP. I cannot continue to be badgered and belittled by you. I already now (sic) how to do a professional job. You hurt our chances with FERC by referring them to Mr. Manley. I am not going to allow you to treat me with a "Master" mentality. I am not your slave. I am a professional sales person and I expect to be tretaed (sic) as such.

Ex. 6, Ricoh_RW_000044-45.

At 10:21 a.m. on June 14, 2013, Glancey forwarded Williams's email to Courtnie Wilford, Director of U.S. Workforce Planning, and Joseph Campanella, Vice-President, Federal, at Ricoh. *Id.* In his email, Glancey stated "Obvious major concerns with his general cooperation, demeanor, and accusations." *Id.* On Saturday, June 15, 2013, Glancey forwarded

Williams's email to Megan Coggins, Senior HR Generalist at Ricoh. *Id.* In his email to Coggins, Glancey stated "Aside from Robert's insubordination, his use of slavery in comparison is horribly & disturbingly offensive. I'm sure we will talk Monday." *Id.* On Saturday, June 15, 2013 at 9:07 p.m., Coggins responded to Glancey's email stating "Hi Tom, I'm in training on Monday morning but I'll connect with you in the afternoon." *Id.* On Sunday, June 16, 2013 at 1:09 a.m., Coggins forwarded her and Glancey's email exchange regarding Williams's request for a meeting to discuss Glancey's treatment of Williams to Wilford, stating "Not good…I'm in training on Monday morning but I can connect with you & Tom in the afternoon." *Id.*

Ricoh has a clear EEO policy requiring HR to investigate all claims of discrimination. Ex. 7, Coggins, Dep. Tr. 27:5 – 29:8. During her deposition, Coggins testified that "if something like [Williams's complaint] was brought to HR's attention, typically we would investigate something like this. Ex. 7, Coggins, Dep. Tr. 38:18 – 39:15. Williams spoke with Coggins and Wilford on the phone to discuss the email further. During the phone call with Wilford to discuss the allegations contained in the June 14, 2013 email, Wilford asked Williams why he said Glancey had a master-slave mentality, and Williams replied "Because I think [Glancey] is racist. Yes." Ex. 2, Williams, Dep. Tr. 176:6 – 13.

Despite Ricoh having a clear EEO policy that requires that HR investigate all complaints of discrimination in the workplace, neither Coggins nor Wilford investigated Williams's complaint. Coggins testified that although she was required to investigate all complaints of discrimination, she can't remember whether she investigated Williams's complaint of discrimination or not. Wilford claims that despite talking to Williams on the phone, she did not ask Williams if he was making a complaint of discrimination. Ex. 7, Coggins, Dep. Tr. 27:5 – 29:8; Ex. 8, Wilford, Dep. Tr. 38:13-15.

On June 17, 2013, Wilford sent Glancey a "Counseling Document Template" for Glancey to fill out prior to issuing Williams a written performance warning. Ex. 9, Ricoh_RW_000049-50. On June 18, 2013, Wilford sent Glancey edits to Glancey's draft written warning, changing Glancey's mention of Williams's "medical situations" to "personal issues." *Id*. On June 20, 2013, Glancey issued Williams a written "Employee Counseling Report," expressly reprimanding and disciplining Williams for, *inter alia*, accusing Glancey of having a "master mentality…treating employee like a slave," and categorizing Williams's email as a "Behavior/ Conduct" issue for which Williams was reprimanded. Ex. 10, Ricoh_RW_000060-61.

Glancey testified during his deposition that he was offended by (and, in fact, was still offended by) Williams's accusing Glancey of having a "master mentality…treating employee like a slave," and so he issued Williams the June 20, 2013 Employee Counseling Report that was Williams's first written warning he had received in his thirteen (13) years of employment at Ricoh:

> 105:8    Q   Were you offended when Mr. Williams said,
>  9  "I'm not going to treat you with a 'master' -- allow
> 10  you to treat me with a 'master mentality'"?
> 11    A  It's an offensive statement. I was
> 12  offended. Yes.
> 13    Q  And when he said, "I am not your slave," did
> 14  you find that offensive?
> 15    A  I did. And I still do.
> 16    Q  And does it make you think less of him?
> 17    A  It doesn't necessarily make me think less of
> 18  him. It's just that it's a horribly offensive
> 19  comparison to draw to anyone.
> 20    Q  Is it something you thought he should be
> 21  disciplined for?
> 22    A  I did. Yes.
> 106:1    Q  And is it one of the reasons that you sought
>  2  discipline for him?
>  3    A  I sought discipline for a number of issues
>  4  related to these e-mails, and that would be one of
>  5  them. Yes.

Ex. 1, Glancey, Dep. Tr. 105:8 – 106:5.

Moreover, Williams' email was the basis for issuing the discipline:

> 112:1     Q   Is Exhibit 10 the e-mail chain that's set
> 2  forth there, the straw that broke the camel's back and
> 3  caused you to issue the discipline marked as Exhibit
> 4  11?
> 5     MS. CONNOLLY:  Asked and answered.  You can
> 6  answer.
> 7   BY MR. WOODFIELD:
> 8   Q  You can go ahead and answer.
> 9     THE WITNESS:  It's fair – it's fair to say.
> 10  Yes.

Ex. 1, Glancey, Dep. Tr. 112:1 to 112:10.

Megan Coggins, the Ricoh's HR generalist who worked with Glancey to produce this discipline could not explain aware of any reason or rationale why Mr. Williams e-mail set was an appropriate basis for the discipline meted out to Williams:

> 48:16     Q  As we sit here today looking at
> 17  Exhibit No. 1 which is the anti-discrimination
> 18  anti-retaliation policy at RICOH and having reviewed
> 19  Exhibit No. 2 in the e-mail that Mr. Williams sent to
> 20  Mr. Glancey that is set forth at the bottom, are you
> 21  aware of any reason or rationale why the e-mail set
> 22  forth in Exhibit No. 2 is an appropriate basis for
> 49:1  discipline in the employee counseling report that is
> 2  set forth in Exhibit No. 3 at RICOHRW331?
> 3     MS. CONNOLLY:  Objection to form.  You may
> 4  answer.
> 5     THE WITNESS:  No.

Ex. 7, Coggins, Dep. Tr., (Pages 48:16 to 49:5).  Nevertheless, following issuance of the written warning in response to Williams's complaint of discrimination, Coggins "encouraged" Williams to apologize to Glancey for alleging that Glancey had discriminated against Williams on the basis of Williams's race.  Ex. 1, Glancey, Dep. Tr. 122:20 – 123:19.  Moreover, Wilford

instructed Williams to apologize to Glancey for alleging that Glancey treated Williams with a slave master mentality. Ex. 2, Williams, Dep. Tr. 185:18 – 186:13.

On August 8, 2013, Glancey issued Williams a second written Employee Counseling Report for allegedly missing work, which referred back to the June 20, 2013 Employee Counseling Report that referred to Williams's protected activity as a basis for discipline. Ex. 11, Ricoh_RW_000088. On December 11, 2013, Glancey issued Williams a third written Employee Counseling Report, threatening Williams with termination. Ex. 12, Ricoh_RW_000066.

On May 2, 2014, Glancey sent an email to Wilford and Campanella, stating "I would like to discuss [Williams's] problematic behaviors *and consider him for termination*." Ex. 13, Ricoh-RW_0000034 (emphasis added). Glancey recommended Williams for termination because although Williams said he was cold calling potential clients during the morning of May 2, 2014, Glancey felt that Williams was "being less than truthful with me." *Id*. Moreover, Glancey claimed that "This has been an ongoing problem with Robert, stretching back for years." *Id*. Despite recommending Williams for termination, Glancey testified during his deposition that "there is certainly some amount of speculation in that statement," and that in fact, "it is possible" that Williams was telling the truth and that Williams was in fact cold calling clients on the morning of May 2, 2014. Ex. 1, Glancey, Dep. Tr. 55:5 – 58:14. Even though Glancey had no basis to believe that Williams's claim that he was cold calling clients was anything other than the truth, Glancey testified that as of May 2, 2014, Glancey was looking to discipline Williams again, with the end goal being termination. Ex. 1, Glancey, Dep. Tr. 130:19 – 131:4.

Thereafter, on July 28, 2014, Glancey issued Williams a fourth written Employee Counseling Report, again referencing the first Employee Counseling Report issued to Williams on June 20, 2013. Ex. 14, Ricoh_RW_000097. On September 11, 2014, Glancey issued

Williams a verbal warning for "unexcused absences," even though Williams provided doctor's records indicating that Williams was out sick due to a flare up of his peripheral neuropathy. Ex. 15, Ricoh_RW_0000340. On January 15, 2015, Glancey terminated Williams's employment for missing a Ricoh customer sponsored event. Williams was unable to attend the event because he needed to attend a funeral on the morning of January 14, 2015, in addition to his mother was admitted to the hospital that same morning. Williams notified Glancey of his mother's emergency condition as soon as Williams became aware of her hospitalization. Ex. 15, Ricoh_RW_0000340; Ex. 2, Williams, Dep. Tr. 45:19 – 50:1; 149:8 – 151:14.

The "Involuntary Termination Summary" Glancey issued to Williams lists the June 20, 2013 Employee Counseling Report as the first written warning issued to Williams and one of the bases for the termination decision. Ex. 15, Ricoh_RW_0000340. During his deposition, Glancey testified that Williams's June 20, 2013 email, the email in which Williams requested a meeting with HR because Williams thought that Glancey was treating him as a master would treat a slave, was "an enough is enough moment," was "the straw that broke the camel's back," and that Glancey issued the first written warning on June 20, 2013 "for that reason":

> 113:21     Q    Okay. Is it fair to say that at this
> 22   juncture, as of June 20, 2013, you had reached a -- a
> 114:1   turning point in your relationship with Robert
> 2   Williams?
> 3      A    I don't know if I'd say a turning point as
> 4   much as this was a -- you used the term "the straw
> 5   that broke the camel's back." I mean, it was just
> 6   sort of a -- kind of an enough is enough moment
> 7   with -- with him with his behavior.
> 8      Q    Is that why you made this a written warning
> 9   as opposed to a verbal warning?
> 10     A   I made it a written warning for that reason.
> 11   Yes.
> 12     Q    And at this point forward, did you make this
> 13   decision that you were going to document any of
> 14   Mr. Williams' shortcomings?

15    A   I made the decision at this moment that I
16  would document significant repeat issues.  Not every
17  single -- you know, not every single issue, right,
18  but -- but significant ones for sure and -- and
19  continued repetition.  Yes.
20    Q   And the purpose of documenting that was to,
21  if necessary, justify Mr. Williams' termination,
22  correct?
115:1    A   Really, the purpose of documenting is to get
2  the employee's attention, to let them know how -- how
3  serious the behavior are with any employee.  You know,
4  you never want, as a manager, to go to formal written
5  discipline unless you really feel that you have to.
6  And that's where I was with Robert.
7       And so while, of course, there is a big part
8  of progressive discipline that says document so that
9  when and if we reach the point of termination there is
10  evidence, if you will.  But the real purpose is to get
11  the employee's attention in hopes the behaviors will
12  change.  And so that was the -- the real intent here.
…
116:12    Q   And if you get to the point where you're
13  terminating someone's employment, do you want to have
14  a written documentary record to rely on to justify
15  that termination decision; is that correct?
16    A   You do.  Yes.
17    Q   And you knew that as of June 20, 2013; is
18  that fair to say?
19    A   I've always known that as a manager.  Yes.

Ex. 1, Glancey, Dep. Tr. 113:21 – 116:19.

The final event cited in the termination decision - Williams's absence at the January 14,
2015 sales event due to Williams's mother's illness and the need to attend a funeral -  would
have only warranted a verbal warning had the employee been anyone other than Williams.  Ex.
1, Glancey, Dep. Tr. 147:5 – 148:20.  Moreover, another employee, Trini Lopez, did miss the
same January 14, 2015 meeting, and was not terminated.  Glancey "just can't remember because
it was, you know, a busy day with lots going on.  And especially with the Robert situation, it was
probably not the first priority to – to remember where – whether she attended or not":

147:5    Q   Okay.  And Ms. Lopez -- if you were aware
6  that Ms. Lopez was not at that event, would you have
7  disciplined Ms. Lopez?
8      A   If she was not at the event without --
9  unexcused?  Without communicating?
10     Q   Yes.
11     A   I would have.
12     Q   Okay.  And would the -- did -- had -- did
13  Ms. Lopez have a history of discipline similar to
14  Mr. Williams'?
15     A   No.
16     Q   What would the level of discipline you would
17  have meted out to Ms. Lopez have been?
18     A   With her it probably would have been a
19  conversation because she didn't have a history -- in
20  fact, kind of the opposite.  She had a history of
21  being supportive and attending these events.  In fact,
22  we had one a few months later that she came in the
148:1  night before and helped us set up and was very -- you
2  know, it wasn't her MO, if you will, to -- to not show
3  up for events.
4       So it would have been a little out of
5  character if she didn't show up.  And so I probably
6  would have just handled with a hey, you know -- I
7  would have asked her kind of like I indicated in the
8  beginning of this -- this deposition.  I would have
9  probably asked her what happened, why weren't you
10  there.  And then depending on the answer, you know,
11  maybe had a conversation about, you know, making sure
12  that, you know, it doesn't happen again and letting me
13  know in advance if she wasn't going to attend.
14     Q   Okay.
15     A   And I want to finish by saying that if -- if
16  in fact she didn't attend, it's most likely that she
17  let me know and I just -- I just can't remember
18  because it was, you know, a busy day with lots going
19  on.  And especially with the Robert situation, it was
20  probably not the first priority to -- to remember
21  where -- whether she attended or not.


Ex. 1, Glancey, Dep. Tr. 147:5 – 148:20.

## II.     Statement of Material Facts in Dispute

Plaintiff does not dispute Defendant's Statement of Undisputed Material Facts ¶¶ 1-17, 20-32, 39-40, 43-44, 46-47, 50, 54-67, 69-76, 78, 80-88, and 90-93. Plaintiff disputes the below-proffered facts and provides citations to the record to support his dispute of those facts.

| Ricoh's Asserted Facts | Williams's Facts Disputing Ricoh's Asserted Facts |
|---|---|
| 18.  Despite these initial issues, Glancey did not discipline Williams as he was a new manager to the team.  (Glancey Dep. at 49.)  Instead, he wanted to "give him a clean slate." (*Id.*) | On May 2, 2014, Glancey sent an email to Wilford and Campanella, stating that "This has been an ongoing problem with Robert, stretching back for years." *Id.* However, the June 20, 2013 Employee Counseling Report was Williams's first written warning he had received in his thirteen (13) years of employment at Ricoh, and Glancey testified during his deposition that he issued the first warning in response to Williams telling Glancey that he would not allow Glancey to treat him like a slave.  Ex. 1, Glancey, Dep. Tr. 105:8 – 106:10. |
| 19.  Glancey wanted "to observe the team and build a professional rapport with the team before coming in and making immediate assessments and disciplinary action."  (Courtnie Wilford Dep. ("Wilford Dep.") at 23, attached as Ex. 6.) | On May 2, 2014, Glancey sent an email to Wilford and Campanella, stating that "This has been an ongoing problem with Robert, stretching back for years." *Id.* However, the June 20, 2013 Employee Counseling Report was Williams's first written warning he had received in his thirteen (13) years of employment at Ricoh, and Glancey testified during his deposition that he issued the first warning in response to Williams telling Glancey that he would not allow Glancey to treat him like a slave.  Ex. 1, Glancey, Dep. Tr. 105:8 – 106:10. |
| 33.  Early on Friday morning, June 14, 2013, Williams and Glancey exchanged the following emails:<br>[Glancey:]  I cannot help you develop a winning proposal by seeing it for the first time the day before its due.  We identified this opportunity over a year ago & you have had more than 2 weeks to begin crafting your response. I want to see your draft by 9am [sic] this morning. If you want to learn how to do a complete & professional job, as you indicate, I suggest you start following my direction instead of ignoring it. | Glancey testified during his deposition that he was offended by (and, in fact, was still offended by) Williams's accusing Glancey of having a "master mentality…treating employee like a slave," and so he issued Williams the June 20, 2013 Employee Counseling Report that was Williams's first written warning he had received in his thirteen (13) years of employment at Ricoh:<br>105:8      Q      Were you offended when Mr. Williams said,<br>9   "I'm not going to treat you with a 'master' -- allow<br>10   you to treat me with a 'master mentality'"?<br>11      A   It's an offensive statement.  I was<br>12   offended.  Yes.<br>13      Q   And when he said, "I am not your slave," did<br>14   you find that offensive?<br>15      A   I did.  And I still do.<br>16      Q   And does it make you think less of him? |

| | |
|---|---|
| [Williams:] Tom, I will request a meeting with Human Resources ASAP. I can not continue to be badgered and belittled by you. I already [k]now how to do a professional job. You hurt our chances with FERC by referring them to Mr. Manley. I am not going to allow you to treat me with a "Master" mentality. I am not your slave. I am a professional sales person and I expect to be treated as such.<br><br>(*Id.*) | 17    A   It doesn't necessarily make me think less of<br>18   him. It's just that it's a horribly offensive<br>19   comparison to draw to anyone.<br>20    Q   Is it something you thought he should be<br>21   disciplined for?<br>22    A   I did. Yes.<br>106:1    Q   And is it one of the reasons that you sought<br>2   discipline for him?<br>3    A   I sought discipline for a number of issues<br>4   related to these e-mails, and that would be one of<br>5   them. Yes.<br>Ex. 2, Glancey, Dep. Tr. 105:8 – 106:5. Moreover, Williams' email was the basis for issuing the discipline:<br>112:1    Q   Is Exhibit 10 the e-mail chain that's set<br>2   forth there, the straw that broke the camel's back and<br>3   caused you to issue the discipline marked as Exhibit<br>4   11?<br>5       MS. CONNOLLY: Asked and answered. You can<br>6   answer.<br>7   BY MR. WOODFIELD:<br>8    Q   You can go ahead and answer.<br>9       THE WITNESS: It's fair – it's fair to say.<br>10   Yes.<br>Ex. 1, Glancey, Dep. Tr. 112:1 to 112:10. |
| 34. Glancey immediately forwarded Williams's email to Courtnie Wilford of Ricoh's Human Resources Department stating: "Please see the email below from Robert. He is insubordinate by refusing to share the working draft of a very large opportunity due on Tuesday. I have asked in writing numerous times and he is withholding." (*Id.*) | Glancey testified that as of May 2, 2014, Glancey was looking to discipline Williams again, with the end goal being termination. Ex. 1, Glancey, Dep. Tr. 130:19 – 131:4.<br>113:21    Q   Okay. Is it fair to say that at this<br>22   juncture, as of June 20, 2013, you had reached a -- a<br>114:1   turning point in your relationship with Robert<br>2   Williams?<br>3    A   I don't know if I'd say a turning point as<br>4   much as this was a -- you used the term "the straw<br>5   that broke the camel's back." I mean, it was just<br>6   sort of a -- kind of an enough is enough moment<br>7   with -- with him with his behavior.<br>8    Q   Is that why you made this a written warning<br>9   as opposed to a verbal warning?<br>10    A   I made it a written warning for that reason.<br>11   Yes.<br>12    Q   And at this point forward, did you make this<br>13   decision that you were going to document any of<br>14   Mr. Williams' shortcomings?<br>15    A   I made the decision at this moment that I |

| | |
|---|---|
| | 16  would document significant repeat issues.  Not every<br>17  single -- you know, not every single issue, right,<br>18  but -- but significant ones for sure and -- and<br>19  continued repetition.  Yes.<br>20     Q   And the purpose of documenting that was to,<br>21  if necessary, justify Mr. Williams' termination,<br>22  correct?<br>115:1     A   Really, the purpose of documenting is to get<br>2  the employee's attention, to let them know how -- how<br>3  serious the behavior are with any employee.  You know,<br>4  you never want, as a manager, to go to formal written<br>5  discipline unless you really feel that you have to.<br>6  And that's where I was with Robert.<br>7        And so while, of course, there is a big part<br>8  of progressive discipline that says document so that<br>9  when and if we reach the point of termination there is<br>10  evidence, if you will.  But the real purpose is to get<br>11  the employee's attention in hopes the behaviors will<br>12  change.  And so that was the -- the real intent here.<br>…<br>116:12     Q   And if you get to the point where you're<br>13  terminating someone's employment, do you want to have<br>14  a written documentary record to rely on to justify<br>15  that termination decision; is that correct?<br>16     A   You do.  Yes.<br>Ex. 1, Glancey, Dep. Tr. 113:21 – 115:12; 116:12 - 116:16. |
| 35.  Thereafter, Wilford had a conversation with Williams, lasting between 15 and 20 minutes, about the how he was feeling and the environment in which he worked.  (Wilford Dep. at 35.)  Wilford questioned Williams on what he meant by the "slave" comment.  According to Wilford, Williams responded that he felt micro-managed by Glancey.  (Wilford Dep. at 37.) | After sending the June 14, 2013 email, Williams spoke with Coggins and Wilford on the phone to discuss the email further.  During the phone call with Wilford to discuss the allegations contained in the June 14, 2013 email, Wilford asked Williams why he said Glancey had a master-slave mentality, and Williams replied "Because I think [Glancey] is racist.  Yes."  Ex. 2, Williams, Dep. Tr. 176:6 – 13.  Nevertheless, Coggins then "encouraged" Williams to apologize to Glancey for alleging that Glancey had discriminated against Williams on the basis of Williams's race.  Ex. 1, Glancey, Dep. Tr. 122:20 – 123:19.  Moreover, Wilford instructed Williams to apologize to Glancey for alleging that Glancey treated Williams with a slave master mentality. Ex. 2, Williams, Dep. Tr. 185:18 – 186:13. |
| 36.   Williams claims that he told Wilford that he believed that Glancey was a "racist." (Williams Dep. at 176.)  Williams claims that prior to this discussion with Wilford, he had | After sending the June 14, 2013 email, Williams spoke with Coggins and Wilford on the phone to discuss the email further.  During the phone call with Wilford to discuss the allegations contained in the June 14, 2013 email, Wilford asked Williams why he said Glancey had a master-slave |

| | |
|---|---|
| complained about Glancey to her before but never tied his complaint to his age or race. (Williams Dep. at 193.) | mentality, and Williams replied "Because I think [Glancey] is racist. Yes." Ex. 2, Williams, Dep. Tr. 176:6 – 13. Nevertheless, Coggins then "encouraged" Williams to apologize to Glancey for alleging that Glancey had discriminated against Williams on the basis of Williams's race. Ex. 1, Glancey, Dep. Tr. 122:20 – 123:19. Moreover, Wilford instructed Williams to apologize to Glancey for alleging that Glancey treated Williams with a slave master mentality. Ex. 2, Williams, Dep. Tr. 185:18 – 186:13. |
| 37.   Although Glancey found Williams's email to be "incredibly offensive" because the terms "master" and "slave" are a "reference to a lot of really horrible things," Glancey did not understand the email to be a reference to racial discrimination.  (Glancey Dep. at 100, 102, 103.) | 102:21     Q    So how many times in your career has an 22  African-American employee said that they are not going 103:1   to allow you to treat them as a slave and you behave 2   like a master? 3   A   Never. 4      Q    Do you understand "master" and "slave" in 5   this e-mail to be anything other than a reference to a 6   racial dichotomy? 7      A   I think they're reference to a lot of really 8   horrible things. 9      Q   My question is a little different than that. 10   Do you understand the reference here to be anything 11   other than a racial dichotomy of a master and slave 12   relationship? 13      A   I didn't think about it in those terms and I 14   still don't really think about it in those terms.  But 15   I understand your question and I understand why you 16   would ask it. 17      Q   Why do you understand that? 18      A    Because slavery was typically an African 19   American -- people were put in slavery. 20      Q    And was that obvious to you on June 14, 21   2013, that the master and slave relationship was 22   typically a white master and a black slave? 104:1      A   I think it's always been since I first 2   learned about it. Ex. 1, Glancey, Dep. Tr.  102:21 - 104:2. |
| 38.   On Monday June 17, 2013, Williams sent the following email to Glancey: "Tom, in my email on Friday I stated that you have a 'master' mentality and for that I sincerely apologize.  Frankly, I was upset and stressed about some circumstances I feel that you and I can work out if you are willing.  Upon seeing you I will apologize in person." (R. Williams Email String | After sending the June 14, 2013 email, Williams spoke with Coggins and Wilford on the phone to discuss the email further.  During the phone call with Wilford to discuss the allegations contained in the June 14, 2013 email, Wilford asked Williams why he said Glancey had a master-slave mentality, and Williams replied "Because I think [Glancey] is racist.  Yes." Ex. 2, Williams, Dep. Tr. 176:6 – 13. Nevertheless, Coggins then "encouraged" Williams to apologize to Glancey for alleging that Glancey had discriminated against Williams on the basis of Williams's |

| | |
|---|---|
| (Williams0000324), attached as Ex. 11.) (Note: On June 18, 2013, Glancey emailed Williams in connection with an unrelated order and stated: "Nice order-thanks for your professionalism this morning, looking forward to a great working relationship & lots of success." (See Email String (RICOH_RW_0000312), attached as Ex. 12.) Williams responded: "Thanks Tom, I appreciate your willingness to work with me. I am fully focused on ... Being a better team member and exhibiting leadership." (*Id.*)) | race. Ex. 1, Glancey, Dep. Tr. 122:20 – 123:19. Moreover, Wilford instructed Williams to apologize to Glancey for alleging that Glancey treated Williams with a slave master mentality. Ex. 2, Williams, Dep. Tr. 185:18 – 186:13. |
| 41. Thereafter, Glancey worked with Wilford to craft an Employee Counseling Report ("ECR") to Williams addressing six discrete performance, abseentism, insubordination and other behavioral issues. (See Email String (RICOH_RW_0000053, attached as Ex. 14; see also ECR (RICOH_RW_000040), attached as Ex. 15.) | Glancey testified that as of May 2, 2014, Glancey was looking to discipline Williams again, with the end goal being termination. Ex. 1, Glancey, Dep. Tr. 130:19 – 131:4.<br>113:21    Q   Okay. Is it fair to say that at this<br>22  juncture, as of June 20, 2013, you had reached a -- a<br>114:1  turning point in your relationship with Robert<br>2  Williams? |
| 42. Glancey decided to issue the ECR at that time because he observed Williams's "behaviors really declin[ing], primarily towards the back half of [June 2012 to June 2013]" and after trying "to address it through coaching, through counseling, through [Williams'] monthly review and plan [("RAP)] sessions, and through less than formal measures" it became "apparent to [Glancey] in June 2013 that enough was enough." (Glancey Dep. at 113.) | 3    A  I don't know if I'd say a turning point as<br>4  much as this was a -- you used the term "the straw<br>5  that broke the camel's back." I mean, it was just<br>6  sort of a -- kind of an enough is enough moment<br>7  with -- with him with his behavior.<br>8    Q  Is that why you made this a written warning<br>9  as opposed to a verbal warning?<br>10    A  I made it a written warning for that reason.<br>11  Yes.<br>12    Q  And at this point forward, did you make this<br>13  decision that you were going to document any of<br>14  Mr. Williams' shortcomings? |
| 45. Williams admits that on August 15, 2013, Williams was absent from work without communicating in advance. (Williams Dep. at 251.) Glancey issued an ECR to Williams as a result. (See ECR (RICOH_RW_0000088, attached as Ex. 16.) | 15    A  I made the decision at this moment that I<br>16  would document significant repeat issues. Not every<br>17  single -- you know, not every single issue, right,<br>18  but -- but significant ones for sure and -- and<br>19  continued repetition. Yes.<br>20    Q  And the purpose of documenting that was to,<br>21  if necessary, justify Mr. Williams' termination,<br>22  correct? |
| 48. When Glancey questioned Williams about his whereabouts on August 30, 2013, Williams stated "it seems like | 115:1    A  Really, the purpose of documenting is to get<br>2  the employee's attention, to let them know how -- how<br>3  serious the behavior are with any employee. You know,<br>4  you never want, as a manager, to go to formal written |

| | |
|---|---|
| every time I slip up or make a mistake I'm written up." (*Id.*) | 5   discipline unless you really feel that you have to.<br>6   And that's where I was with Robert.<br>7        And so while, of course, there is a big part<br>8   of progressive discipline that says document so that<br>9   when and if we reach the point of termination there is<br>10   evidence, if you will.  But the real purpose is to get<br>11   the employee's attention in hopes the behaviors will<br>12   change.  And so that was the -- the real intent here.<br>…<br>116:12      Q    And if you get to the point where you're<br>13   terminating someone's employment, do you want to have<br>14   a written documentary record to rely on to justify<br>15   that termination decision; is that correct?<br>16      A   You do.  Yes.<br>Ex. 1, Glancey, Dep. Tr. 113:21 – 115:12; 116:12 - 116:16. |
| 49.   Williams admits that he was slipping up and making mistakes a lot in 2013.  (Williams Dep. at 257.) | 257:15      Q.   And were you slipping up in August of<br>16   2013 and making mistakes?<br>17      A.   I was -- yes.  And basically because I<br>18   was very, very frustrated and stressed, health<br>19   issues, what's happening to him at work, I wasn't<br>20   making any money at that time because I was just<br>21   demoralized, so to speak, or depressed, so to<br>22   speak (sic).<br>23        Because I knew I had been trying my best<br>24   and been doing my best, and to receive this<br>25   treatment all of a sudden after so many years, you<br>258:1   know -- and, frankly, I loved Ricoh.  But when Tom<br>2   came along, all that changed.  I still -- I ain't<br>3   going to say I hate Ricoh, but I hated -- I ain't<br>4   going to say, I hate nobody.  I disliked the<br>5   treatment I was receiving from the manager, and<br>6   the fact that I couldn't get no assistance from<br>7   HR.  And that started to affect me.<br>Ex. 2, Williams, Dep. Tr. 257:15 – 258:7. |
| 51.   In December 2013, Glancey issued to Williams a final written warning after he annotated a work order that had already been signed by a customer in violation of Ricoh policy. (See ECR (RICOH_RW_0000087, attached as Ex. 19.) | Glancey testified that as of May 2, 2014, Glancey was looking to discipline Williams again, with the end goal being termination. Ex. 1, Glancey, Dep. Tr. 130:19 – 131:4.<br>113:21      Q    Okay.  Is it fair to say that at this<br>22   juncture, as of June 20, 2013, you had reached a -- a<br>114:1   turning point in your relationship with Robert<br>2   Williams?<br>3      A   I don't know if I'd say a turning point as<br>4   much as this was a -- you used the term "the straw<br>5   that broke the camel's back."  I mean, it was just |

| | |
|---|---|
| 52. Although Ricoh had a basis to terminate Williams for this conduct, Glancey "didn't want to terminate him" because he "really wanted him to ... change ... and be a leader and part of the team." (Glancey Dep. at 127-28.) | 6 sort of a -- kind of an enough is enough moment<br>7 with -- with him with his behavior.<br>8    Q Is that why you made this a written warning<br>9 as opposed to a verbal warning?<br>10    A I made it a written warning for that reason.<br>11 Yes. |
| 53. Glancey's issuance of a final written warning to Williams in December 2013 was "not at all" motivated by Williams's accusation six month earlier that Glancey treated him like a "slave." (Glancey Dep. at 129.) | 12    Q And at this point forward, did you make this<br>13 decision that you were going to document any of<br>14 Mr. Williams' shortcomings?<br>15    A I made the decision at this moment that I<br>16 would document significant repeat issues. Not every<br>17 single -- you know, not every single issue, right,<br>18 but -- but significant ones for sure and -- and |
| 68. Within a few days thereafter in January 2015, Glancey consulted with his managers (Brown and Campanella) and with Wilford on whether to terminate Williams given his "long and well-documented history" of attendance issues. (Glancey Dep. at 149.) Brown, Campanella and Wilford all supported the termination. (See Brown Dep. at 45; see also Termination Summary (RICOH_RW_000089), attached as Ex. 31.) | 19 continued repetition. Yes.<br>20    Q And the purpose of documenting that was to,<br>21 if necessary, justify Mr. Williams' termination,<br>22 correct?<br>115:1    A Really, the purpose of documenting is to get<br>2 the employee's attention, to let them know how -- how<br>3 serious the behavior are with any employee. You know,<br>4 you never want, as a manager, to go to formal written<br>5 discipline unless you really feel that you have to.<br>6 And that's where I was with Robert.<br>7      And so while, of course, there is a big part<br>8 of progressive discipline that says document so that<br>9 when and if we reach the point of termination there is<br>10 evidence, if you will. But the real purpose is to get<br>11 the employee's attention in hopes the behaviors will<br>12 change. And so that was the -- the real intent here.<br>…<br>116:12    Q And if you get to the point where you're<br>13 terminating someone's employment, do you want to have<br>14 a written documentary record to rely on to justify<br>15 that termination decision; is that correct?<br>16    A You do. Yes.<br>Ex. 1, Glancey, Dep. Tr. 113:21 – 115:12; 116:12 - 116:16. |
| 77. Approximately six months after Glancey began managing Williams, Williams claims he developed the belief that Glancey was a racist based solely on the tone of voice that Williams perceived Glancey to use with him and "other blacks." (See Williams Dep. at 169.) | 168:20    Q. And how long had Tom been managing you<br>21 at the time of this discussion with Jackie?<br>22    A. Six, eight months, maybe.<br>23    Q. Okay. And during that six- to<br>24 eight-month period was he using that tone that you<br>25 found to be demeaning?<br>169:1    A. Yes.<br>2    Q. Okay. Was Dan terminated at this point?<br>3    A. Dan was still there. |

| | |
|---|---|
| | 4     Q.  What about Eric?<br>5     A.  Eric was still there.<br>6     Q.  Had the DOE meeting or the DVA meeting<br>7  taken place?<br>8     A.  No, ma'am.<br>9     Q.  Okay.  So at the time that you answered<br>10  yes to Jackie three or four years ago, the only<br>11  thing that you were relying on, am I right, was<br>12  the way he was talking to you?<br>13     A.  And other blacks.<br>14     Q.  What other examples, if any, do you<br>15  have?<br>16     A.  The same tone as -- I don't know how to<br>17  say it or document it, but you just have to see<br>18  it.  You have to experience it.<br>Ex. 2, Williams, Dep. Tr. 168:20 – 169:18. |
| 79.  Williams claims that after he began receiving discipline from Glancey in June 2013 for missing meetings, he developed the belief that non-African-American employees- Trini Lopez, Lance Helmick and Jeannie Hooks- failed to show up at meetings but did not receive discipline for it. (*See* Williams Dep. at 61 ("no one was written up for missing one of these events except me"); *see also id.* at 70.) | 60:17    Q.  Okay.  So having received this, you<br>18  understood that you were expected to show up and<br>19  bring your prospects and customers to these types<br>20  of events; right?<br>21     A.  No.<br>22     Q.  Why not?<br>23     MR. WOODFIELD:  Objection.  Go ahead.<br>24     THE WITNESS:  Because it's not mandatory<br>25  attendance.  Okay.  We have a team effort.  If you<br>61:1  could not be there, it happened several times as a<br>2  manager, he would entertain your customers or he<br>3  would assign a team member to entertain your<br>4  customers.  No one was ever written up for missing<br>5  one of these events except for me.<br>6     Q.  How do you know that?<br>7     A.  Because I know my team members, we<br>8  talked.<br><br>62:17    Q.  Okay.  So you have knowledge about<br>18  people who told you who else wasn't there, but<br>19  you're not going to disclose that at your<br>20  deposition?<br>21     MR. WOODFIELD:  You have to answer.<br>22     THE WITNESS:  Okay.  I was told by<br>23  Terrance Deans that Trini Lopez wasn't there.  And<br>24  I asked Trini was she there, after my termination.<br>25  BY MS. CONNOLLY:<br>63:1    Q.  And what did Trini say?<br>2     A.  She said she -- she said no.<br>3     Q.  Trini said, no, I didn't go to FedEx |

4   Field?
5       A.   Correct.  And then I talked to her again
6   maybe January of this year, and she told me she
7   received a text from Tom Glancey asking if she was
8   there.  And she told him -- she told him that she
9   couldn't recall.
10      Q.   Was she lying to Tom Glancey when she
11  said she couldn't recall?
12      A.   I have no idea why Tom texted her.  To
13  me, he should have known.
14      Q.   Okay.  Let me just make sure my question
15  is clear.  So it's your testimony that when you
16  discussed with Trini whether she was there, she
17  affirmatively told you that she did not go.
18      A.   Correct.
19      Q.   But that when Tom Glancey asked her if
20  she went --
21      A.   She said she couldn't remember.
22      Q.   Okay.
23      A.   So I asked why he -- why she couldn't
24  remember.  I don't know what he was getting at, so
25  I just said that.

69:25     Q.   Okay.  Let's talk about Lance for a
70:1  minute.  So you say you think he missed a couple
2   of events?
3       A.   I'm not sure of the one, but he missed a
4   lot of team meetings, too, but they always excused
5   him.
6       Q.   Let's talk about the events first and
7   we'll talk about the team meetings second.
8       A.   Okay.
9       Q.   Okay.  So with respect to events, how
10  long has -- is Lance a current employee?
11      A.   Twenty-eight years.
12      Q.   He's been there for 28 years?
13      A.   Yes.
14      Q.   And he's still there?
15      A.   Yes.
16      Q.   Okay.  And can you remember specific
17  events that he missed?
18      A.   No, I can't.
19      Q.   What is the basis for your statement
20  that you know that Lance missed a couple?  How do
21  you know that?
22      A.   Because he missed a lot of things.

| | |
|---|---|
| | 23   Because we used to talk about it. |
| | 24     Q.   You had a discussion with Lance? |
| | 25     A.   We discussed it with the team members, |
| | 71:1   why was Lance always excused from meetings.   And |
| | 2   Trini and Jeannie. |
| | 3     Q.   Who was party to these discussions? |
| | 4     A.   Mark Harris, Terrance Deans, Susan Tool, |
| | 5   all the team members. |
| | Ex. 2, Williams Dep. at 60:17 – 61:8;  62:17 – 63:25; 69:25 – 71:5. |
| 89.   Despite his belief that Glancey was a racist and that Williams was not being treated fairly by him, Williams admits that he never tied Glancey's treatment of him to his race: [Question:]   Tell me about any discussions you had with Tom Glancey wherein you told him that you believed that he was treating African-Americans more harshly? [Answer:]  I just told Tom about me.  I didn't tell me about other employees.   I complained to him about the way he was treating me. [Question:] ... When did you do that? [Answer:]  Several - several occasions. At our RAP sessions.  And I refused to sign some of his write-ups.  Then he would call me and harass me.  Then he threw the box at me the day I was leaving, and things like that. [Question:] And did you tie that to your race? [Answer:]  I knew it was going downhill, so that's when I went to my exit interview. I didn't tell them what I really thought.  I knew what I planned to do, and I knew it was wrong and I planned to do something about it, so I didn't tell them everything. No, I did not. [Question:] [D]id you ever tell Tom Glancey when you were complaining about his treatment of you that you felt he was treating you differently than he was treating non- African-American people? [Answer:] No. (Williams Dep. at 180 (emphasis added).) | During the phone call with Wilford to discuss the allegations contained in the June 14, 2013 email, Wilford asked Williams why he said Glancey had a master-slave mentality, and Williams replied "Because I think [Glancey] is racist.  Yes." Ex. 2, Williams, Dep. Tr. 176:6 – 13. Therefore, Williams not only made a complaint of race discrimination when he sent the June 14, 2013 email, but he explicitly told Wilford,  a HR professional at Ricoh, that he sent the email because he felt that Glancey was racist. |

### III.    Summary Judgment Standard

Defendant correctly notes that summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Facts are material when proof of their existence or nonexistence would affect the case's outcome. *Anderson*, 477 U.S. at 248. An issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such issues. *Id*. at 248. A court must view facts and reasonable inferences drawn from such facts in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). A court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

### IV.    Williams Establishes A *Prima Facie* Case Of Discrimination Under Title VII.

Williams has presented a *prima facie* case of discrimination based on race.  In order to state a *prima facie* case of discrimination, the plaintiff must establish (1) he is a member of a protected class; (2) he was subject to an adverse employment action; and (3) there was an inference of unlawful discrimination or that he was treated differently than people outside the protected class.  *See Burgoon v. Potter*, 369 F. Supp. 2d 789 (E.D. Va. 2005) (citing *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Webster v. Rumsfeld*, 156 Fed. App'x 571, 578 (4th Cir. 2005) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)).  The causation standard set forth in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013), is "but-for" causation. However, in *Foster v. University of Maryland—Eastern Shore*, 787 F.3d 243, 249, 252 (4th Cir. 2015), the Fourth Circuit explained that while *Nassar* changed the causation standard for claims

based on direct evidence of retaliatory animus, "*Nassar* does not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim." The instant case does not rely on direct evidence, so it must be judged under the causation standard developed for *McDonnell Douglas* claims, not the standard outlined for *Nassar*:

> To prevail under the *McDonnell Douglas* framework, [Plaintiff] must first establish a *prima facie* case by showing: (i) "that [she] engaged in protected activity," (ii) "that [her employer] took adverse action against [her]," and (iii) "that a causal relationship existed between the protected activity and the adverse employment activity."…The burden then shifts to the [Defendant] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason…If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons "were not its true reasons, but were a pretext for discrimination."

*Foster*, 787 F.3d at 250 (internal citations omitted). The Forth Circuit in *Foster* also confirmed that *Nassar* has no bearing on the causation element or pretext stage of the *McDonnell Douglas* framework. *See id*. at 251-252.

**A. Plaintiff is a Member of Protected Class and Engaged in Protected Activity.**

Defendant does not dispute that Williams is African-American.

**B. Plaintiff Engaged in Protected Activity**

During her deposition Coggins testified that it was her job to determine whether an employee had made a complaint of discrimination. Ex. 7, Coggins, Dep. Tr. 24:21 – 25:2. Coggins testified that it was her job to investigate any concern brought forward by an employee, "whatever that concern is." Ex. 7, Coggins, Dep. Tr. 26:10 – 11. Moreover, Coggins testified that as a HR professional, she was required to investigate whether an employee's complaint of unfair treatment, even if couched in less than artful terms, was nonetheless a complaint of discrimination. Ex. 7, Coggins, Dep. Tr. 65:3 – 10. With respect to Williams's June 14, 2013

email in which Williams requested a meeting with HR and stated that he would not permit

Glancey to treat him with a "master" mentality as a master would treat a slave, Coggins testified

that "typically, if an employee were to come with this type of an allegation, we would investigate

it." Ex. 7, Coggins, Dep. Tr. 36:14 – 37:37:10. Moreover, Coggins confirmed that she

understood Williams's email to Glancey to be an allegation of discrimination and that she had no

basis to believe that Williams's allegation was false or was anything other than it was purported

to be. Ex. 7, Coggins, Dep. Tr. 39:17 – 40:1; 64:6 – 65:3; 65:15 – 66:2. Likewise, Williams

testified that he explicitly told Wilford that he believed that Glancey was racist." Ex. 2,

Williams, Dep. Tr. 176:6 – 13. Moreover, Williams made this statement to Wilford during a

phone conversation to discuss Williams's June 14, 2013 email in which he stated that Glancey

treated Williams with a slave master mentality. As a result, Coggins and Wilford, both HR

professionals, were aware that Williams's email was a complaint of race discrimination, and a

request for HR to intervene.

### C. Defendant Concedes that Plaintiff's Performance was Considered Satisfactory Up Until Plaintiff Engaged in Protected Activity

In *Wheat v. Florida Parish Juvenile Justice Comm'n*, 811 F.3d 702 (5th Cir. 2016), *affirmed in part and reversed in part*), the Fifth Circuit held that the defendant's more lenient treatment of plaintiff for the same sort of offense before she exercised her FMLA and Title VII rights, compared to its harsh treatment of her afterwards, created a jury issue of causation. Similarly, it's inconsistent treatment of other employees, sometimes harsh and sometimes not, created a dispute of material fact. *Id.* On May 2, 2014, Glancey sent an email to Wilford and Campanella, stating "I would like to discuss [Williams's] problematic behaviors and consider him for termination," as "[t]his has been an ongoing problem with Robert, stretching back for years." Ex. 13, Ricoh-RW_0000034 (emphasis added). However, during his deposition, Glancey explicitly identified

the starting point of the documentation of Williams's performance issues as being Williams's June 14, 2013 email in which Williams complained of racial discrimination. Specifically, Glancey testified that Williams's June 14, 2013 email in which Williams requested a meeting with HR to address reasonably perceived racial discrimination was "the straw that broke the camel's back," as the email prompted Glancey to start documenting Williams's alleged performance deficiencies in order to build a case for termination. Ex. 1, Glancey, Dep. Tr. 112:1 – 10. When asked whether the email chain between Williams, Glancey, Coggins, and Wilford, which contained William's request for a meeting with HR to address reasonably perceived racial discrimination was "the straw that broke the camel's back and caused [Glancey] to issue [the discipline to Williams]", Glancey replied "It's fair – it's fair to say. Yes." *Id.*

### D. Ongoing Discipline Is An Adverse Employment Action.

The Fourth Circuit has held that an employee's mere dissatisfaction with an aspect of work does not mean the employer has committed an actionable adverse action. However, if the aspect of work effects a term, condition, or benefit of employment, or has a tangible effect on employment, it does rise to the level of an adverse action. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (citing *Von Gunton v. Maryland*, 243 F.3d 858, 867 (4th Cir. 2001) (internal citations omitted). "We have repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition 'is not limited to "economic" or "tangible" discrimination,' *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)), and that it covers more than 'terms' and 'conditions' in the narrow contractual sense." *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)).

As the Court stated in *Harris*, "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment…' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." 510 U.S. at 21 (some internal quotation marks omitted) (quoting *Meritor*, 477 U.S. at 64, in turn quoting *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707, n. 13 (1978)). "Workplace conduct is not measured in isolation…" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (per curiam). Courts have found that "a change in working conditions may be a factor to consider in assessing whether a reassignment qualifies as an adverse employment action that could give rise to…liability." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999).

## V.      Williams Establishes A *Prima Facie* Case Of Retaliation Under Title VII.

To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in a protected activity, (2) the defendant took an adverse employment action against him, and (3) a sufficient causal connection existed between the protected activity and defendant's adverse employment action. *See Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir. 1996). In so doing, the plaintiff must show that "a reasonable employee would have been dissuaded by the adverse action from making or supporting a charge of discrimination." *Chapman*, 2012 WL 1533514, at *21 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

On June 14, 2013, Williams engaged in protected activity when he emailed Glancey, his supervisor, to request a meeting with Human Resources "ASAP," stating "I cannot continue to be badgered and belittled by you. I already now (sic) how to do a professional job. You hurt our chances with FERC by referring them to Mr. Manley. I am not going to allow you to treat me

with a "Master" mentality.  I am not your slave.  I am a professional sales person and I expect to be tretaed (sic) as such." Ex. 6, Ricoh_RW_000044-45.  Williams's email to Glancey clearly articulates perceived discrimination on the basis of race worthy of investigation by HR, and as a result constitutes protected activity.

When engaging in protected activity, a plaintiff "must show that he or she held a good faith, subjective, and objectively reasonable belief that the employer engaged in discriminatory conduct.  *Peters v. Jenney*, 3278 F.3d 307, 320-21 (4th Cir. 2003).  Moreover, protected activity need not mention a legally defined category in order to constitute protected activity.  *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).  Rather, "[o]pposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id*.  In fact, the Fourth Circuit recently opined in its holding in *Boyer-Liberto v. Fountainbleau Corp.* that:

> We also recognize that an employee is protected from retaliation when she reports an isolated incident of harassment that is physically threatening or humiliating, even if a hostile work environment is not engendered by that incident alone. Finally, we specify that, to the extent today's decision is in conflict with *Jordan v. Alternative Resources Corp.*, 458 F.3d 332 (4th Cir.2006), *Jordan* is hereby overruled.

786 F.3d at 268-269.

An employee need not use "magic words" in order to successfully make a complaint of discrimination to an employer based on a protected characteristic.  *Okoli v. City Of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011).  In *Okoli*, the court held that the defendant "surely should have known" that an employee's email titled "harassment complaint" and a memo alleging "unethical and unprofessional business characteristics, e.g. harassment, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues

(anyone in the City Government) and lack or disregard for integrity" constituted protected activity. *Id*. at 224. In the current case, Williams, an African American, emailed Glancey, his Caucasian supervisor, on June 14, 2013, explicitly requesting a meeting with Human Resources "ASAP," and stating "I am not going to allow you to treat me with a "Master" mentality. I am not your slave. I am a professional sales person and I expect to be treated (sic) as such." Ex. 6, Ricoh_RW_000044-45. Glancey forwarded Williams's email to Coggins, in Human Resources, who in turn sent Williams's email to Wilford, also in Human Resources, stating "not good." *Id*.

After sending the June 14, 2013 email, Williams spoke with Coggins and Wilford on the phone to discuss the email further. During the phone call with Wilford to discuss the allegations contained in the June 14, 2013 email, Wilford asked Williams why he said Glancey had a master-slave mentality, and Williams replied "Because I think [Glancey] is racist. Yes." Ex. 2, Williams, Dep. Tr. 176:6 – 13. Therefore, Williams not only made a complaint of race discrimination when he sent the June 14, 2013 email, but he explicitly told Wilford, a HR professional at Ricoh, that he sent the email because he felt that Glancey was racist.

In addition, Williams's understanding that Glancey treated African American employees with a master-slave mentality was well known amongst Glancey's subordinates. Kelly Wynn, an African American employee, testified that he heard from Williams and some of Williams's co-workers that Glancey had a slave master mentality. Ex. 3, Wynn, Dep. Tr. 38:19 – 39:6. Wynn said that Glancey's "slave master mentality" was "well-noted dialogue that was had amongst peers," and that another Ricoh employee named Randall Smith, a Ricoh employee named "Clarence" [*presumably Terrance Deanes*], and another employee whose name Wynn could not remember also said that Glancey had a slave master mentality with respect to African American employees. Ex. 3, Wynn, Dep. Tr. 39:17 – 21; 41:6 - 19. Likewise, Duane Graves, another

African American colleague of Williams, testified that "Glancey was looking for reasons to get rid of the black sales employees under him," and that when Glancey terminated an African American employee, Glancey always filled the position with a Caucasian employee. Ex. 4, Graves, Dep. Tr. 81:2 – 7; 12-15. Similarly, another African American colleague of Williams, Alexander Johnson, testified that Glancey was pressuring Johnson to leave Ricoh so that Glancey could give Johnson's job to a Caucasian female who had no prior experience in the industry. Ex. 5, Johnson, Dep. Tr. 69:13 – 71:12. Likewise, Johnson testified that Glancey issued warnings to African American employees who missed meetings, but did not do the same for Lance Helmick and Dan Logan, Caucasian employees who also missed meetings. Ex. 5, Johnson, Dep. Tr. 72:10 – 18; 119:11 – 120:13. Johnson also testified that "Williams spoke up about Glancey's unfair treatment, as the rest of his colleagues were afraid to report it." Ex. 5, Johnson, Dep. Tr. 106:5 – 17. Johnson identified the colleagues who were afraid to report Glancey's unfair treatment as Randall Smith, Mark Evans [*presumably Mark Harris*], and a man named Kevin, all of whom were African American. Ex. 5, Johnson, Dep. Tr. 107:9 – 108:4. Johnson also testified that in his opinion, Glancey was prejudiced against minorities, including African Americans. Ex. 5. Johnson, Dep. Tr. 117:2 – 20.

That Williams's statement states a race complaint as its substance is obvious if considered in its converse. If Glancey emailed Williams on June 14, 2013, explicitly requesting a meeting with Human Resources "ASAP," and stating "I am going to treat you with a "Master" mentality. You are my slave." There is no dispute that this would evidence racially motivated discrimination, and so Williams' complaint averring the same statements in protest is evidence of a complaint of racially motivated discrimination. Therefore Glancey, as well as Coggins and Wilford, both HR professionals, knew or surely should have known that Williams was making a

complaint of discrimination based on race on account of both Williams's June 14, 2013 email and Williams's subsequent phone conversation with Wilford. Likewise, multiple African American employees who reported to Glancey discussed openly the fact that Glancey treated them with a slave master mentality. Against this backdrop, Williams's June 14, 2013 email was clear and unambiguous – Williams was making a complaint of race discrimination against Glancey, he wanted to meet with HR to address the discrimination, and in a follow-up phone call he explicitly told Ricoh's HR that he felt that Glancey was racist.

### 1. Ricoh Considered Williams's June 14, 2013 Email to be Protected Activity

During her deposition, Coggins testified that it was her job to determine whether an employee had made a complaint of discrimination. Ex. 7, Coggins, Dep. Tr. 24:21 – 25:2. Coggins testified that it was her job to investigate any concern brought forward by an employee, "whatever that concern is." Ex. 7, Coggins, Dep. Tr. 26:10 – 11. Moreover, Coggins testified that as a HR professional, she was required to investigate whether an employee's complaint of unfair treatment, even if couched in less than artful terms, was nonetheless a complaint of discrimination. Ex. 7, Coggins, Dep. Tr. 65:3 – 10. With respect to Williams's June 14, 2013 email in which Williams requested a meeting with HR and stated that he would not permit Glancey to treat him with a "master" mentality as a master would treat a slave, Coggins testified that "typically, if an employee were to come with this type of an allegation, we would investigate it." Ex. 7, Coggins, Dep. Tr. 36:14 – 37:37:10. Moreover, Coggins confirmed that she understood Williams's email to Glancey to be an allegation of discrimination, and that she had no basis to believe that Williams's allegation was false or was anything other than it was purported to be. Ex. 7, Coggins, Dep. Tr. 39:17 – 40:1; 64:6 – 65:3; 65:15 – 66:2. Likewise, Williams testified that he explicitly told Wilford that he believed that Glancey was racist." Ex.

2, Williams, Dep. Tr. 176:6 – 13.  Moreover, Williams made this statement to Wilford during a phone conversation to discuss Williams's June 14, 2013 email in which he stated that Glancey treated Williams with a slave master mentality.  As a result, Coggins and Wilford, both HR professionals, were aware that Williams's email was a complaint of race discrimination, and a request for HR to intervene.

## 2. Ricoh Retaliated Against Williams for Engaging in Protected Activity

In order to establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that he engaged in a protected activity; (2) that her employer took an adverse employment action against him; and (3) that there was a causal link between the two events. *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005); s*ee also Von Gunten v. Maryland,* 243 F.3d 858, 863 (4th Cir.2001) (citing *Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir.1997)). After establishing a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  If the employer does so, the burden shifts back to the plaintiff to show that the proffered reasons offered by the employer are mere pretext for retaliation.  *Id*.

After engaging in protected activity, an employee is protected by Title VII from retaliation when "the employee opposes not only employment actions actually unlawful under Title VII but also employment actions [he] reasonably believes to be unlawful; the Title VII violation may be complete, or it may be in progress."  *Boyer-Liberto v. Fountainbleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (citing *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005) (employee seeking protection from retaliation must have an objectively

reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress); *Peters v. Jenney,* 327 F.3d 307, 320 (4th Cir.2003) (concluding, in reliance on decisions under Title VII, that "to show protected activity, the plaintiff in a Title VII retaliation case need only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring" (alterations and internal quotation marks omitted)). In other words, an employee is protected from retaliation when he opposes a hostile work environment that, although not fully formed, is in progress.

Moreover, the Fourth Circuit has held that the "hope and expectation" is that employees will report suspected Title VII violations early, before such suspected violations rise to the level of a hostile work environment. *Boyer-Liberto*, 786 F.3d at 283 (4th Cir. 2015). Moreover, when "the harasser is [his] supervisor and no tangible employment action has been taken, the victim is compelled by the *Ellerth/Faragher* defense to make an internal complaint, i.e., "to take advantage of any preventive or corrective opportunities provided by the employer." *See Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 2293 (1998). If an employee reports such suspected discrimination, they are protected from retaliation under Title VII. *Boyer-Liberto*, 786 F.3d at 285 (4th Cir. 2015).

During her deposition, Coggins stated that "[i]t's not appropriate for an employee to – for a manager to discipline an employee for making an allegation" because such discipline would violate the anti-retaliation of Ricoh's EEO policy. Ex. 7, Coggins, Dep. Tr. 39:17 – 40:7. Moreover, Coggins could not think of a single reason why it would have been appropriate for Glancey to discipline Williams for requesting a meeting with HR to address perceived racial discrimination. Ex. 7, Coggins, Dep. Tr. 41:5 – 43:14. Despite Coggins's testimony that she could not think of a reason why disciplining Williams for making a complaint of discrimination

would ever be appropriate, Coggins confirmed that the June 20, 2013 Employee Counseling Report issued by Glancey to Williams explicitly stated that Williams was being disciplined for stating that Glancey treated Williams as a master would treat a slave.  Ex. 7, Coggins, Dep. Tr. 44:14 – 46:5; Ex. 8, Ricoh_RW_000060-61.

In addition to retaliating against Williams for making a complaint of discrimination, Wilford instructed Williams to apologize to Glancey for sending the June 14, 2013 email, even though Williams told Wilford that he wrote the email because he felt that Glancey was racist. Ex. 2, Williams, Dep. Tr. 176:6 – 13; 185:18 – 186:13. Therefore Coggins, Williams's designated HR representative, Wilford, another HR representative, and Glancey, Williams's supervisor, retaliated against Williams for making a complaint of racial discrimination by issuing, in writing, a warning to Williams which labeled his complaint of discrimination as a "behavior/conduct" issue.

### 3. Williams's Protected Activity was the "Straw That Broke The Camel's Back" And Resulted in Williams's Termination

Glancey stated that Williams's June 14, 2013 email in which Williams requested a meeting with HR to address reasonably perceived racial discrimination was "the straw that broke the camel's back," and it prompted Glancey to start documenting Williams's alleged performance deficiencies in order to build a case for termination. Ex. 1, Glancey, Dep. Tr. 112:1 – 10.  When questioned about Ricoh's stated reasons for terminating Williams, Glancey testified that Williams's email was an "enough is enough moment with – with [Williams's] behavior," and that Glancey disciplined Williams "for that reason. Yes." Ex. 1, Glancey, Dep. Tr. 113:21 – 114:11. In *Wheat v. Florida Parish Juvenile Justice Comm'n*, 811 F.3d 702 (5th Cir. 2016), *affirmed in part and reversed in part*), the Fifth Circuit held that the defendant's more lenient treatment of plaintiff for the same sort of offense before she exercised her FMLA and Title VII

rights, compared to its harsh treatment of her afterwards, created a jury issue of causation.[2] Similarly, its inconsistent treatment of other employees, sometimes harsh and sometimes not, created a dispute of material fact. *Id.*

On May 2, 2014, Glancey sent an email to Wilford and Campanella, stating "I would like to discuss [Williams's] problematic behaviors and consider him for termination," as "[t]his has been an ongoing problem with Robert, stretching back for years." Ex. 13, Ricoh-RW_0000034 (emphasis added). However, Glancey testified that as of June 20, 2013, the date of the written warning in response to Williams's complaint of discrimination, that Glancey wanted a written documentary record to justify terminating Williams. Ex. 1, Glancey, Dep. Tr. 116:12 - 19. As a result of the actions taken by Glancey, Coggins, and Wilford against Williams in response to Williams's June 14, 2013 complaint of racial discrimination, Ricoh effectively admitted liability for retaliating against Williams in violation of Title VII.

---

[2] Specifically, the *Wheat* Court noted:

> After providing its revised explanation, the Commission did not make any reference, corrective or otherwise, to its original non-retaliatory explanation for discharging Wheat ("[n]o JDS officer [ ] ever physically attacked a youth ... [or was] allowed to remain in the Commission's employ after any such attack").[3] In other words, the grounds for Wheat's discharge related solely to the incidents of January 3, 2012, immediately preceding her discharge. In this light, the Commission offers no evidence or argument to distinguish this different treatment of Wheat before and after exercising her protected rights.[4] Therefore, the Commission's inconsistent treatment of Wheat raises disputed issues of material fact as to whether: but for exercising her rights she would have been discharged.

> > n. 3 On appeal, for the first time, the Commission "agree[d] that to the extent Ms. Wheat's prior use of excessive force shows that her conduct was not unprecedented, the Commission stood corrected." *Appellee Brief*, at 34.

> > n. 4 Although the Commission has consistently described the 2005 incident in its briefing before the district court, and this Court, it has never attempted to address or explain why it treated Wheat differently in 2005, than it did in 2012.

*Wheat*, 811 F.3d at 710-11.

## VI.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment as to ADA Retaliation, ADA Interference, FMLA Interference, and FMLA Retaliation should be denied.

Plaintiff Robert Williams,

/s/ Nicholas Woodfield
Nicholas Woodfield, Esq., VSB # 48938
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
nwoodfield@employmentlawgroup.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of July, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent an electronic notification of such filing to all parties of record.  I further certify that a true copy of the filing was also served via electronic mail upon the following:

John T. McDonald
REED SMITH LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540-7839
(609) 524-2041 (Telephone)
(609) 951-0824 (Facsimile)
jmcdonald@reedsmith.com

Helenanne Connolly
REED SMITH LLP
3110 Fairview Park Drive, Suite 1400
Falls Church, Virginia 22042
(703) 641-4504 (Telephone)
(703) 641-4340 (Facsimile)
hconnolly@reedsmith.com

/s/Nicholas Woodfield
Nicholas Woodfield